NO. 17-16729

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT


FADI G. HADDAD, M.D.,
Plaintiff - Appellant,
v.
SMG LONG TERM DISABILITY
PLAN; HARTFORD LIFE &
ACCIDENT INSURANCE
COMPANY,
Defendants - Appellees.


On Appeal From a Judgment of the United States District Court
Eastern District of California
Honorable William H. Orrick
Case No. 16-cv-01700-WHO


**APPELLANT'S OPENING BRIEF ON APPEAL**

Laurence F. Padway (SBN 83914)
LAW OFFICES OF LAURENCE F. PADWAY
1516 Oak Street, Suite 109
Alameda, California 94501
Tel:  (510) 814-6100
Fax: (510) 814-0650

Attorneys for plaintiff-appellant Fadi G. Haddad

# Table of Contents

I.  Introduction                                                                      1

II.  Jurisdiction                                                                     6

III.  Issue                                                                           6

IV.  Statement of Facts                                                               6

    1.  The Pre-existing Condition Limitation            6
    2.  Spinal Anatomy                                          9

V.  Statement of the Case                                                            10

VI. Standard of Review                                                               13

VII.  Summary of the Argument                                                        16

VIII.  Argument                                                                      17

    1.  Rules for *de Novo* Review of Disability Insurance       17
    2.  The Process of Nature Rule Governs
    Pre-existing Condition Limitations                            19
    3.  "Pre-Existing Condition" May Refer to Anatomical
    Structures,  Symptoms, or Diagnoses                           22
    4.  Dr. Haddad Did Not Receive Medical Care "FOR"
    Either Left Side Symptoms or the Artificial Disk During the
    Lookback Period                                               24

IX.  Conclusion                                                                      31

**Table of Authorities**

## Cases

*Abatie v. Alta Health & Life Ins. Co.,*
458 F.3d 955 (9th Cir. 2006)  14

*Babikian v. Paul Revere Life Ins. Co.,*
63 Fed. 3d 837 (9th Cir., 1995)  14

*Brooker v. Desert Hospital Corp.,*
947 F.2d 412 (9th Cir. 1991)  15

*Cigna Corp. v. Amara,*
563 U. S. 421 (2011)  18

*Critchlow v. First Unum Life,*
378 F. 3d 246 (2nd Cir., 2004)  19

*Farley v. Benefit Trust Life,*
979 F. 2d 653 (8th Cir., 1992)  19

*Firestone Tire & Rubber Co. v. Bruch,*
489 U.S. 101 (1989)  14

*Glista v. Unum Life Ins.,*
378 F. 3d 113 (1st Cir., 2004)  19

*Horton v. Reliance Standard,*
141 F. 3d 1038 (11th Cir., 1998)  19

*Kunin v. Benefit Trust Life Ins. Co.,*
910 F.2d 534 (9th Cir., 1990) (as amended), cert. denied, 498 U.S. 1013  17

*McClure v. Life Ins. Co. of N. Am.,*
84 F.3d 1129 (9th Cir. 1996)  14, 17
18-21

*McGee v. Equicor-Equitable HCS,*
953 F. 2d 1192 (10th Cir., 1992)  19

*McLeod v. Hartford Life & Acc. Ins. Co.*,
372 F.3d 618 (3d Cir. 2004)                                24 -31

*Saltarelli v. Bob Baker Group Medical Trust,*
35 F.3d 382 (9th Cir., 1994)                               15, 17

*Smith v. CMTA-IAM Pension Trust,*
654 F. 2d 650 (9th Cir., 1981)                             32

*United States v. McConney*,
728 Fed. 2d 1195 (9th Cir., 1984)                          15

*Wilden v. Washington National Ins. Co.,*
18 Cal. 3d 631 (1976)                                      20


**Federal Statutes**

28 U.S.C. § 1291                                           6

29 U.S.C. § 1132                                           6

Fed. R. Civ. Proc. 52                                      15

29 C. F. R. 2560.503-1                                     10

**Treatises**

Eck, Jason, MedicineNet.com, "Radiculopathy,"
https://www.medicinenet.com/radiculopathy/article.htm     10

O'Rahilly, et al., Basic Human Anatomy, Chapter 39 and 40.   9

# I
## Introduction

Dr. Fadi Haddad began working for Sutter Medical Group as a pediatric gastroenterologist on July 28, 2014. He became covered by Sutter's disability plan on that date. Before beginning that employment, Dr. Haddad suffered from "degenerative disk disease" of the C5-6 disk (ER 1061) Serial MRI's showed "foraminal stenosis" on the right side, and a posterior disc spur complex to the right of the midline, "which was variously read as either possibly or definitely compressing the exiting right C6 nerve." ER 937. "This pathology explains right arm and hand symptoms, but would not produce left arm symptoms, and there were no left side symptoms." ER 937-938. This anatomy caused a C5-6 RIGHT side radiculopathy, with pain and numbness from the neck down the RIGHT arm to the thumb. ER 1, 937-938. These symptoms did not prevent Dr. Haddad from working.

On March 5, 2015 – seven months after he was employed by Sutter Medical Group – Dr. Haddad underwent surgery, which completely removed the diseased and degenerated C5-6 disc and replaced it with an artificial one. X-rays taken and viewed during the surgical procedure showed the new artificial disc properly placed. ER 1047. This surgery successfully eliminated the right-side

radiculopathy, that is, the pain and numbness which ran down Dr. Haddad's right arm.

But by March 23, 2015, Dr. Haddad began having symptoms which were eventually diagnosed as a new problem, involving the LEFT C6[1] nerve instead of the RIGHT one. ER 1061. X-rays taken weeks after surgery showed that the new artificial disk had flexed, but the surgeons concluded that the placement was acceptable, ER 1062, although flexion of the artificial disk is not normal. ER 937. Dr. Haddad went on to develop left sided neck pain, left upper back and left shoulder paresthesias, with some paresthesias in the left third and fourth digits. The appearance of these LEFT side symptoms post surgery is documented on EMG which shows a LEFT side C6 lesion, which was not present prior to the surgery. ER 938. These symptoms were to severe that they prevented Dr. Haddad from working as a pediatric gastroenterologist. Dr. Haddad filed a claim for disability benefits.

---

[1]The LEFT C6 nerve exits the spinal cord through the foramen on the left side of the spine between the C5 and C6 vertebrae, and sometimes is referred to as the left C5-6 nerve.

The Plan[2] limits benefits to six weeks for any "disability that results from, or is caused or contributed to by, a Pre-existing condition." "Pre-existing condition is defined, in relevant part, as "any manifestations, symptoms, findings, or aggravations related to or resulting from" the injury or sickness "**for which** You received Medical Care during" the six month period before the effective date of the coverage,[3] which is called the "lookback" period. ER 2-3, citing ER 1075 [emphasis added]. Of course, Dr. Haddad's LEFT side symptoms were not "manifestations, symptoms," etc., **for which** he received treatment during the six month "lookback" period, because none of those symptoms arose until after the March 5, 2015 surgery. ER 937-938.

The trial court, Hon. William Orrick, judge presiding, held on *de novo* review, that "under the plain language of the Plan, the preexisting condition exclusion applies because *the left side disabling symptoms were 'caused or*

_____

[2]We discuss, *infra*, that neither the ERISA Plan document, nor the insurance policy, were produced, which the District Court acknowledges at ER 7-9. The District Court was forced to *assume* that the Certificate of Insurance produced by the Plan accurately recounts the pre-existing condition limitation of the Plan and the Policy, because that summary document is the only one in the record. We likewise *assume, arguendo,* the accuracy of that language so that we may discuss the pre-existing condition limitation. See ER 7-9.

[3]This six month period is January 28, 2014 until July 27, 2014.

*contributed to' by the treatment for the pre-existing degenerative disk disease."*
ER 2:3-6. [emphasis added]. We believe the District Court erred by effectively
adding "treatment" to the phrase "any manifestations, symptoms, findings or
aggravations..."

Dr. Haddad appeals because:

1. The artificial disc was not surgically implanted in Dr.
Haddad's spine until March 5, 2015. Since it did not exist
during the "lookback" period, neither it nor anything it
caused can be a preexisting condition.

2. The preexisting condition was the diseased
degenerative C5-6 disc. It was completely removed by
the March 5, 2015, surgery. Therefore, it cannot be the
cause of any post-surgical condition.

3. The effect of the preexisting condition was a pinched
nerve on the right side of Dr. Haddad's spine at the C5-6

level. The March 5, 2015, surgery completely eliminated the "pinching" of that nerve, and its effects. The left-sided radiculopathy that Dr. Haddad later developed resulted from the pinching of a ***different nerve*** – the one exiting from the spinal cord through the left side of the opening in the C5-6 vertebrae.[4]

Dr. Haddad appeals the trial court determination because the insurer cannot meet its burden of proof of this coverage exclusion. On *de novo* review, the District Court failed to consider the reasonable expectations of the policy holder, or the doctrine of contra proferentem, and the District Court erred in adding complications of treatment to the claimed definition of "preexisting condition."

//

//

//

---

[4] The district court did not seem to appreciate that there are two distinct nerves involved. One exits the spinal cord on the right side of the spine through the foramen formed by the alignment of the C5 and C6 vertebrae. The other nerve exits the spinal cord through the foramen on the left side of those vertebrae.

## II
## Jurisdiction

Jurisdiction in the trial court arose under ERISA, 29 U.S.C. §1132. The trial court entered a final judgment as to all parties and claims on August 23, 2017. ER 16. Dr. Haddad filed his timely notice of appeal on August 25, 2017. ER 15. Jurisdiction on appeal arises under 28 U.S.C. § 1291.

## III
## Issues

Did the trial court err by holding that "disabling symptoms caused by a ***surgery to treat*** a pre-existing condition fall under" the pre-existing condition limitation? ER 1, 13:16, and 2:3-6 [emphasis added].

## IV
## Statement of Facts

### 1. The Pre-existing Condition Limitation.

The correct language for the Pre-existing Condition is not in the record, as the District Court acknowledged at ER 7-9. The District Court *assumed,* however, that the language in a Certificate of Insurance, which describes itself as a

summary document, is the same as the language in the Policy and the Plan document, neither of which are in the record.  We similarly *assume, arguendo,* the accuracy of that language.  The Certificate reads, at ER 1095:

> **Pre-Existing Conditions Limitation:** *Are benefits limited for Pre-existing Conditions?*
>
> We will only pay benefits, or an increase in benefits, under The Policy for any Disability that results from, or is caused or contributed to by, a Pre-existing Condition for up to 6 week(s),unless, at the time You become Disabled:
>
> 1) You have not received Medical Care for the condition for 6 consecutive month(s) while insured under The Policy; or
>
> 2) You have been continuously insured under The Policy for 12 consecutive month(s).
>
> **Pre-existing Condition means:**
>
> 1) any Injury, Sickness, Mental Illness, pregnancy, or episode of Substance Abuse; or
>
> 2) any ***manifestations, symptoms, findings, or aggravations related to or resulting from such*** Injury, Sickness, Mental Illness, pregnancy, or Substance Abuse;
>
> for which You received Medical Care during the 6 month(s) period that ends the day before:
>
> 1) Your effective date of coverage; or
> 2) the effective date of a Change in Coverage.
>
> ER 1075, quoted in part at ER 2:22-3:4, citing ER 1075.

The District Court refers to "treatment" for a condition as if it were a "manifestation, symptom, finding, or aggravation" "related to or resulting from such" condition "for which You received Medical Care..." Thus, at ER 2:3-6, the District Court ruled:

> "I conclude that under the plain language of the Plan, the pre-existing condition exclusion applies because the left side disabling symptoms were "caused or contributed to by the treatment for the pre-existing degenerative disk disease."

The facts are not disputed. Dr. Haddad had a pre-existing condition of (1) degenerative disc disease of the C5-6 disc with a right side radiculopathy producing symptoms down the right arm to the thumb, which did not disable him and (2) underwent a surgical repair which included complete removal of the diseased C5-6 disc, and its replacement with an artificial disc. The operative report and imaging done during surgery shows the artificial disk was properly placed and fitted. ER 860-861. (3) At some point, the artificial disk "flexed" as shown on imaging taken on March 232, 2015. ER 918. While this is not normal, the surgeon, after consulting with industry experts, believed the disc placement was adequate. (4) Dr. Haddad was left with correction of his pre-existing right side radiculopathy, but the onset of new, left side, neck and arm symptoms, that is, a left C5-6 radiculopathy, which was disabling. ER 1, ER 937-938.

## 2.  Spinal Anatomy.

Seven vertebrae, stacked one on top of the other, comprise the cervical spine.  These bones are denominated as C1, C2, C3, etc.  There is a tunnel through the center of these vertebrae through which runs the spinal canal, which holds the spinal cord, which carries nerves from the brainstem to the periphery of the body.

In between the vertebrae lie the intervertebral disks, which act as a cushion between the vertebrae.  The disks are named by their location.  The disk between the fourth and fifth cervical vertebrae, for example, is called the C4-5 disk. See, O'Rahilly, et al., Basic Human Anatomy, Chapter 39 and 40.

Parts of adjoining vertebrae come together to form openings, or foramen.  Nerves from the brain run through the spinal canal and exit the spine through these foramen as they travel to the periphery of the body.  If the disk changes shape, for example, as a result of degenerative disk disease or herniation of the disk, the foramen may become narrowed which is called "foraminal stenosis."  This may compress or "pinch" the nerve as it passes through the foramen, resulting in pain and numbness along the route of the nerve as it goes

from the spinal cord down the arm and into the hand. This is called a

radiculopathy, or sometimes a "pinched nerve." Eck, Jason, MedicineNet.com,

"Radiculopathy," https://www.medicinenet.com/radiculopathy/article.htm.


On March 5, 2015, the diseased and degenerated C5-6 disk was

completely removed surgically, and replaced with an artificial disk. For reasons

which are not known, while the surgery cured the right side C5-6 radiculopathy,

either at the time of, or in the days and weeks after surgery, a new injury arose,

this time to the left C5-6 foramen --a left side radiculopathy. Instead of the pre-

existing right arm and hand symptoms, Dr. Haddad was left with left neck, left arm

and left hand symptoms. The right sided symptoms were not disabling. The new

left side symptoms are disabling. ER 937-938.


## V
### Statement of the Case


Dr. Haddad exhausted his administrative remedies under ERISA . In

any claim based upon a medical judgment, Hartford is required to consult with a

medical expert as part of the administrative appeal under the Department of Labor

regulations, 29 C. F. R. 2560.503-1(h)(3)(iii) and (h)(4). Hartford failed to have

such a consultation.

Notwithstanding its failure to consult medical experts, Hartford denied Dr. Haddad's claim, ER 54-56, and subsequent administrative appeal, relying solely upon the pre-existing condition exclusion, finding that "[t]hough the claimant may not have had left sided symptoms before his 03/05/2015 surgery, they are the direct result of Treatment for his Pre-existing cervical diagnosis." ER 49-51. While Hartford's administrative decision was made in connection with an application for short term disability benefits, Dr. Haddad filed suit for both short and long term disability benefits because the pre-existing condition limitation, if it bars full payment of short term benefits, would also bar payment of long term benefits. Complaint, Docket 1.

The litigation is notable for the failure of Hartford or the Plan to produce (a) the correct applicable insurance policy, and (b) the Plan document. Instead, Hartford produced a Certificate of Insurance, which is a summary type of document. The District Court discusses this issue at ER 7-9, and it attempts to cobble together enough pieces to allow it to assume what the correct policy actually says, and what the Plan document would say, assuming that there is one

other than the insurance policy.  The District Court explains its decision at ER 7 -9

to *assume* that the Certificate of Insurance accurately describes the content of the

policy and the Plan.  But the Certificate states that:

> "The provisions of the Participating Employer's coverage
> under The Policy, which are important to You, are
> summarized in this certificate consisting of this form and
> any additional forms which have been made a part of this
> certificate...The Policy alone is the only contract under
> which payment will be made.  Any difference between
> The Policy and this certificate will be settled according to
> the provisions of The Policy on file with Us at Our home
> office."

After discussing the missing policy, the district court decided that the

"exclusions are to be determined under the language of the Plan."  ER 9:12-13.

But there is no "Plan" document in the record.  The District Court nevertheless

held that the ***Plan*** had an exclusion for "pre-existing conditions," but then solely

used the language from the Certificate of Insurance (ER 1089 at 1095) for its

analysis at ER 2-3, because neither the Plan nor the correct insurance policy is in

the record.

We argued that the failure to produce the policy, which controls over

the Certificate, made it legally impossible for Hartford to meet its burden of proof

concerning the terms of the pre-existing condition limitation, and its burden of proof that the exclusion is "clear, plain and conspicuous." The District Court held that the limitation was "clear, plain and conspicuous," but did so by reference to the Certificate of Insurance, not by reference to the Plan or the controlling insurance policy. ER 7-9, and ER 2-3. The District Court errs in its statement at ER 2:20-21 that "[w]ith respect to pre-existing conditions, the Plan provided:," since the language which follows comes from the Certificate of Insurance and not a Plan document.

The case was set for trial on the administrative record on July 17, 2017. The district court issued its Order Granting Defendant's Motion for Judgment on August 23, 2017. ER 1. The district court ruled only on the short term benefits, and did not decide the claim for long term benefits. ER 14 at fn. 8. The district court issued its final judgment that same day. ER 16. Dr. Haddad filed a timely notice of appeal on August 25, 2017. ER 15.

//

//

# VI
## Standard of Review

The district court reviews the decision of the Plan *de novo*, unless the

plan document gives the plan fiduciary discretionary authority, in which case

the district court reviews for abuse of discretion. *Firestone Tire and Rubber*

*Co. v. Bruch,* 489 U. S. 101, 115 (1989). California Insurance Code 10110.6

invalidates discretionary clauses in insured plans after the 2012 policy

anniversary. Accordingly, the District Court properly reviewed the decision of

Hartford and the Plan *de novo*. Under this standard, "[t]he court simply

proceeds to evaluate whether the plan administrator correctly or incorrectly

denied benefits." *Abatie v. Alta Health and Life Ins. Co.,* 458 F. 3d 955, 963

(9th Cir., 2006) *en banc*.


The District Court found "persuasive" a number of out of circuit

district court decisions, ER 9 - 11, which were almost without exception

deferential review cases. The different standard of review is important,

however, because this Court "interprets] terms in ERISA insurance policies in

an ordinary and popular sense as would a person of average intelligence and

experience." *Babikian v. Paul Revere Life Ins. Co.,* 63 Fed. 3d 837, 840 (9th

Cir., 1995) (internal quotations and citation omitted). "[A]mbiguous language is construed against the insurer and in favor of the insured." *McClure v. Life Ins. Co. of North America,* 84 Fed. 3d 1129, 1134 (9th Cir., 1996).

An exclusion of coverage in an insurance program subject to ERISA must be "clear, plain and conspicuous, as part of the "reasonable expectations doctrine," which grew out of the law of adhesion contracts. This Court expressed the doctrine:

> In general, courts will protect the reasonable
> expectations of applicants, insureds, and intended
> beneficiaries regarding the coverage afforded by
> insurance carriers even though a careful examination of
> the policy provisions indicates that such expectations
> are contrary to the expressed intention of the insurer.
>
> *Saltarelli v. Bob Baker Group Medical Trust,*
> 35 F.3d 382, 387 (9th Cir., 1994).

The standard of review in this Court is *de novo*, because there are no disputed facts of any consequence. If there were disputed factual findings, those would be reviewed under a clearly erroneous standard. Fed. R. Civ. Proc. 52(a). The district court's conclusions of law are reviewed *de novo. Brooker v. Desert Hospital Corp*., 947 F.2d 412, 415 (9th Cir. 1991).

Arguments relating to the duty of the Plan to produce the correct documents, should be reviewed *de novo* because it requires the consideration of legal concepts and the "values that animate legal principles." *United States v. McConney*, 728 Fed. 2d 1195, 1202 (9th Cir., 1984).

## VII
## Summary of the Argument

1.  The Plan cannot meet its burden of showing that the pre-existing condition limitation was contained in the controlling insurance policy or any other Plan document, because it failed to produce them.

2.  Assuming, arguendo, that the applicable language is that contained in the Certificate of Insurance (which states that the matter is controlled by the insurance policy, and not by the Certificate) the language is ambiguous and this Court should construe the exclusion, following the "reasonable expectations" doctrine, the rule of "contra proferentem" and the "natural progression" rule, under which a condition is considered pre-existing if it is the natural progression of the earlier condition.

3. Complications from the effects of treatment are not within the plain meaning of the language used in the Certificate.  If Hartford had wanted to limit coverage for complications of treatment it should have said so.

4.  The language "any manifestations, symptoms, findings, or aggravations related to or resulting from" the injury or sickness "**for which** You received Medical Care during" the lookback period, (ER 2-3, citing ER 1095) [emphasis added] cannot apply here because Dr. Haddad did not receive any medical care for left sided symptoms, or a displacement of an artificial disk, during the "lookback" period.  These conditions did not arise until after the March 5, 2015 surgery, and the "lookback" period ended when Dr. Haddad's coverage became effective January 28, 2014.

## VIII
## Argument

### 1.  Rules for *de Novo* Review of Disability Insurance.

ERISA insurance policies are governed by the rule that ambiguous language is construed against the insurer and in favor of the insured, under the doctrine of *contra proferentem*. *Kunin v. Benefit Trust Life Ins. Co.*, 910 F.2d 534,

539-40 (9th Cir., 1990) (as amended), cert. denied, 498 U.S. 1013, *McClure v.*

*Life Ins. Co. of N. Am.*, 84 F.3d 1129, 1134 (9th Cir., 1966).  Furthermore, the

doctrine of reasonable expectations applies to policies in ERISA plans:

> In general, courts will protect the reasonable expectations
> of applicants, insureds, and intended beneficiaries
> regarding the coverage afforded by insurance carriers even
> though a careful examination of the policy provisions
> indicates that such expectations are contrary to the
> expressed intention of the insurer.
>
> *Saltarelli v. Bob Baker Group Medical Trust,*
> 35 F.3d 382, 387 (9th Cir., 1994).

Where, as here, the Plan and its insurer failed to produce the correct

insurance policy and the Plan document (if there is one other than the policy), it is

inappropriate to rely on a summary document, such as the Certificate of Insurance.

Thus, the Supreme Court held it error to rely on a Summary Plan Description

instead of the Plan document in *Cigna Corp. v. Amara,* 563 U. S. 421, 436-438

(2011), holding that "the summary documents, important as they are, provide

communication with beneficiaries *about* the plan, but that their statements do not

themselves constitute the *terms* of the plan..." *Id.,* at 438.  Similarly, in *McClure v.*

*Life Ins. Co. of N. Am.*, 84 F.3d 1129, 1136  (9th Cir., 1996), the record in the

Ninth Circuit did not contain the insurance policy and so this Court could not

determine whether the pre-existing condition clause was conspicuous.  It ruled in

the alternative, depending upon the conspicuity issue, and then remanded to the

trial court to obtain and review the insurance policy.  In this case, the District

Court considered a declaration from the Plan submitted after the close of briefing,

in which the Plan conceded it could not locate the correct insurance policy, so it

instead supplied an earlier edition.  ER 7-9.  If the insurer and Plan could not find

the controlling document, how can they meet their burden of proof to show the

terms and conspicuity of the exclusion?  An insurer's contention that a loss is

excepted by the terms of the policy is an affirmative defense.  *Farley v. Benefit

Trust Life,* 979 F. 2d 653, 658 (8th Cir., 1992).  See also, *Glista v. Unum Life Ins.,*

378 F. 3d 113, 131-132 (1st Cir., 2004), *Critchlow v. First Unum Life,* 378 F. 3d

246, 257 (2nd Cir., 2004), *McGee v. Equicor-Equitable HCS,* 953 F. 2d 1192,

1205(10th Cir., 1992), *Horton v. Reliance Standard*, 141 F. 3d 1038, 1040 (11th

Cir., 1998).


### 2.  The Process of Nature Rule Governs Pre-existing Condition Limitations

In *McClure v. Life Insurance Co. of N. Amer.,* 84 F. 3d 1129, 1135 (9th

Cir., 1996), a fire fighter, had a pre-existing back condition.  He tripped over a

guide wire and accidentally fell.  McClure was able to continue working light

duty, but almost a year after the fall, McClure was forced to stop working as no

light duty was available. The parties stipulated that the fall had set in motion a

deterioration which resulted in McClure's total disability. The trial court found

that McClure's disability was the result of a "process of nature," and McClure was

entitled to benefits despite his pre-existing condition because the fall was the

proximate cause of his disability. "Under the 'process of nature' rule, a claimed

disability is considered to have occurred immediately within the meaning of a

total disability policy provision when it follows directly from the accidental injury

within the time the process of nature takes." *McClure v. Life Ins. Co. of N. Am.*, 84

F.3d 1129, 1133 (9th Cir., 1996). See *Wilden v. Washington National Ins. Co.,* 18

Cal. 3d 631, 635 (1976) ("the onset of disability relates back to the time of the

accident 'whenever the disability arises directly from the accident [and] within

such time as the process of nature consumes in bringing the person affected to a

state of total [disability].'" A policyholder who is injured during the policy period

and slowly deteriorates over several years may be covered even though he became

totally disabled after the policy expired.).


In *McClure*, at 1133, the Ninth Circuit applied the "process of nature"

rule applied to ERISA cases under federal common law. Further, "[e]ven without

relying on the "process of nature" rule, under the stipulation and the undisputed

facts, and applying general federal rules of contract interpretation, the Ninth

Circuit held that McClure was continuously and totally disabled immediately

following the accident, and permanently and totally disabled within one year."

*Ibid.* The insurer argued that it only insures against loss "resulting directly and

independently from all other causes from bodily injuries caused by accident." It

argued that McClure's pre-existing back condition meant that his disability was

not independent of the accidental fall. The Ninth Circuit noted that it did not have

the actual insurance policy in the record, and therefore could not discern whether

the limitation was conspicuous. It therefore held in the alternative:

> "...we hold that if the exclusionary language here in
> question is conspicuous it would bar recovery if a
> preexisting condition substantially contributed to the
> disability. This could result in a denial of recovery even
> though the claimed injury was the predominant or
> proximate cause of the disability. On the other hand, we
> hold that if the language is inconspicuous, a policy holder
> reasonably would expect coverage if the accident were the
> predominant or proximate cause of the disability.
>
> *McClure v. Life Ins. Co. of N. Am.*,
> 84 F.3d 1129, 1136  (9th Cir., 1996)

The insurer and the Plan had the obligation to produce the policy and

any other Plan documents. When they failed to do so, they prevented the District

Court from assessing the conspicuity of the pre-existing condition provision.

If we apply the process of nature rule here, there is no natural progression from a right side C5-6 radiculopathy to a left sided one. It is not a natural process to insert an artificial disk to replace a diseased one. A pre-existing condition limitation is read by the average person consistent with the process of nature rule. It is an unnatural and strained reading to say that a failure of an artificial disk is somehow the natural progression of a C5-6 radiculopathy. Accordingly, to avoid the process of nature rule, a pre-existing condition limitation must clearly, plainly, and conspicuously state that the insurer or Plan is imposing a greater limitation than that imposed by the process of nature rule.

### 3. "Pre-Existing Condition" May Refer to Anatomical Structures, Symptoms, or Diagnoses

The Certificate of Insurance, whose language the District Court analyzed, does not define the word "condition," which is ambiguous. Condition in this context could mean (1) anatomical structures, (2) symptoms or (3) diagnoses.

There is nothing about the anatomical structure which is pre-existing. The diseased C5-6 disk was completely removed in the March 5, 2015 surgery. The artificial disc placed during that surgery did not exist prior to the date of

surgery.  Compression of the right C5-6 or C6 nerve producing right sided symptoms is a completely different anatomical structure than compression of the left side C5-6 or C6 nerve, which produces left sided symptoms.

Plainly, if the word "condition" means anatomical structure, there is no pre-existing condition exclusion in this case.

Similarly, if the word condition means "symptoms," there are pre-existing right side symptoms, and later left side symptoms, so that defining condition to mean "symptoms" does not place this case within the pre-existing condition limitation.

Finally, if "condition" means diagnosis, the preexisting diagnosis is degenerative disk disease and right side C5-6 radiculopathy.  The later condition is status post placement of artificial disk and left side C5-6 radiculopathy. Because the right side and left are different, here again, there is no pre-existing condition.

//

//

### 4. Dr. Haddad Did Not Receive Medical Care "FOR" Either Left Side Symptoms or the Artificial Disk During the Lookback Period

The District Court simply ignored a crucial line in the Certificate's definition of pre-existing condition:

> **Pre-existing Condition means:**
>
> 1) any Injury, Sickness, Mental Illness, pregnancy, or episode of Substance Abuse; or
>
> 2) any manifestations, symptoms, findings, or aggravations related to or resulting from such Injury, Sickness, Mental Illness, pregnancy, or Substance Abuse;
>
> **for which You received Medical Care during the 6 month(s) period** that ends the day before:
>
> 1) Your effective date of coverage; or
> 2) the effective date of a Change in Coverage.

In other words, in order to be a pre-existing condition, there has to be some medical treatment of the post condition during the "lookback" period. It is not enough to have something that is somehow "related to or resulting from" the pre-existing condition, the insured must also have had Medical Care for that post condition during the lookback period. Plainly, Dr. Haddad had no Medical Care for any left sided symptoms during the lookback period. The District Court apparently overlooked the Medical Care requirement.

In *McLeod v. Hartford Life and Accident Ins. Co.,* 372 F. 3d 618 (3rd

Cir., 2004), Hartford's language was reviewed.  The plan participant had pre-

existing symptoms which at the time were of unknown cause, but after the

coverage began, she was diagnosed with MS, and in hindsight, the earlier

symptoms were attributable to the MS.  The Court held:


> The language at issue before us revolves around the
> meaning of two terms: 'for' and 'symptom.' The Hartford
> Plan defines neither. We have already undertaken the
> analysis of 'for' in  Lawson, 301 F.3d 159. There, Elena
> Lawson was taken to the emergency room two days before
> her insurance policy became effective, for what was
> initially diagnosed as a respiratory tract infection. One
> week later, after the effective date of her policy, she was
> correctly diagnosed as having leukemia. The insurance
> company denied coverage of medical expenses relating to
> the leukemia on the ground that it was a pre-existing
> condition for which Lawson received treatment prior to
> the effective date. Lawson's parents, acting on her behalf,
> sued for breach of contract and we affirmed the District
> Court's grant of their motion for summary judgment.
>
> The Lawson panel framed the issue in the following way:
> 'The central issue in this case is whether receiving
> treatment for the symptoms of an unsuspected or
> misdiagnosed condition prior to the effective date of
> coverage makes the condition a pre-existing one under the
> terms of the insurance policy. In other words, we must
> determine whether it is possible to receive treatment 'for'
> a condition without knowing what the condition is.'   Id.
> at 162.

Addressing this issue, the Lawson panel held that the word 'for' 'has an implicit intent requirement' and that 'it is hard to see how a doctor can provide treatment 'for' a condition without knowing what that condition is or that it even exists.' Id. at 165. In reaching this conclusion, the Court engaged in a detailed analysis of other courts' renderings of the word 'for' in similar contexts, noting that although there are differing readings of what constitutes receiving treatment 'for' a condition, the word 'for' itself must, by definition, include a notion of intentionality. See id. (''for' is 'used as a function word to indicate purpose'' (quoting Webster's Ninth New Collegiate Dictionary 481 (1986))).

As quoted above, the Plan at issue here defines a pre-existing condition, in relevant part as:

(2) any manifestations, symptoms, findings, or aggravations related to or resulting from such accidental bodily injury, sickness, mental illness, pregnancy, or substance abuse;

*for* which you received Medical Care during the 90 day period that ends the day before:

(1) your effective date of coverage  (italics supplied).

McLeod contends that in order to have been properly denied coverage under the Plan, she would have had to receive care from a physician *for* the MS or *for* the 'manifestations, symptoms, findings, or aggravations' of MS during the look-back period. She submits that intentionality is a key component of receiving medical care and that the presence of the word 'for' in the policy language is crucial.

In  Pilot Life Insurance. Co. v. Dedeaux, 481 U.S. 41, 56, 95 L. Ed. 2d 39, 107 S. Ct. 1549 (1987), the Supreme

Court noted that Congress intended that 'a federal common law of rights and obligations under ERISA-regulated plans would develop.' Importing and extending the logic of Lawson, a contract case, into the ERISA context, is consistent with that teaching. Finding the Lawson analysis persuasive, we construe the term 'for' to contain the Lawson element of intentionality. Given that construction, Hartford's interpretation must be rejected at all events, and certainly when a heightened standard of review applies.

## B.

If McLeod's case presented nothing more than a dispute over whether she had received treatment for MS (as opposed to the symptoms of MS), then the only question before us would be whether we could apply the straightforward logic of Lawson to an ERISA case where the heightened Pinto review obtains. ...There is, however, one significant difference between McLeod's case and the one presented in Lawson: Here, the policy language is more precise and encompasses a broader range of elements in its definition of what constitutes a pre-existing condition than did the policy at issue in Lawson.

In the Plan at issue here, a pre-existing condition includes medical care received for any 'manifestations, symptoms, findings, or aggravations related to or resulting from such accidental bodily injury, sickness, mental illness, pregnancy, or substance abuse' (emphasis added) as opposed to the policy at issue in Lawson which defined a pre-existing condition as a 'Sickness, Injury,  disease or physical condition for which medical advice or treatment was recommended by a Physician or received from a Physician' during the relevant look-back period.  Lawson, 301 F.3d at 161. [Fn omitted]

Hartford places great stock in the difference in the language of the two policies, arguing that 'unlike the Plan in this case, the Lawson policy's definition of pre-existing condition did not encompass treatment for symptoms of a sickness.' At first blush, this distinction seems noteworthy, and the fact that the Hartford Plan includes words such as 'manifestations' and 'symptoms,' which the policy at issue in Lawson did not, seems potentially significant. [fn omitted] The District Court certainly thought that to be the case when it stated that: 'The Plan does not require that a participant's disabling condition be diagnosed within the look-back period in order for it to be considered a 'Pre-Existing Condition'; rather, it merely requires that a participant receive medical care for a symptom or manifestation of the condition during the look-back period.' McLeod v. Hartford Life & Accident Ins. Co., 247 F. Supp. 2d 650, 660 (E.D. Pa. 2003). The Court explained that it was 'eminently reasonable for Hartford to conclude that when Plaintiff sought treatment from Dr. DiGregorio for numbness in her left side in February 1999, Plaintiff sought treatment for a 'manifestation' or 'symptom' of her MS.' Id. We disagree. As stated above, Hartford does not define the term 'symptom.' A dictionary definition of the word 'symptom' reads:

Symptom: 1. Med. A functional or vital phenomenon of disease; any perceptible change in any organ or function due to morbid conditions or to morbific influence, especially when regarded as an aid in diagnosis. Symptoms differ from signs in the diagnosis of a disease in that the former are functional phenomena, while the latter are incidental or experimental.

2. That which serves to point out the existence of something else; any sign, token, or indication.

Funk & Wagnalls New Standard Dictionary of the English

Language 2246 (1942).

It appears to us from this definition that a 'symptom' is a meaningful term only because it is a 'symptom' in relation to something else. McLeod's  symptom of numbness became relevant as one the Plan used to exclude her from coverage based on a pre-existing condition only once it was deemed a 'symptom of MS.' If it were just a random 'symptom' of some undiagnosed ailment, then Hartford would not be concerned with it. Given that the symptom becomes a factor in the exclusion process only once it is tied to the diagnosis of the sickness, in this case MS, we do not see on what basis Hartford can successfully argue that there exists a significant difference between the language of the Hartford Plan and the language of the insurance policy in  Lawson. Indeed, the Hartford Plan still bases the exclusion on 'symptoms . . . for which you received Medical Care.' (emphasis added). This construction simply begs the obvious question: symptoms of what? Hartford offers no satisfactory answer to this question.

In  Lawson, we sought to avoid precisely the type of ex post facto denial of benefits that Hartford has undertaken here:

'Although we base our decision on the language of the policy, we note that considering treatment for symptoms of a not-yet-diagnosed condition as equivalent to treatment of the underlying condition ultimately diagnosed might open the door for insurance companies to deny coverage for any condition the symptoms of which were treated during  the exclusionary period. 'To permit such a backward- looking reinterpretation of symptoms to support claims denials would so greatly expand the definition of preexisting condition as to make that term meaningless: any prior symptom not inconsistent with the ultimate diagnosis

would provide a basis for denial.'

301 F.3d at 166 (quoting Ermenc v. American Family
Mut. Ins. Co., 221 Wis. 2d 478, 585 N.W.2d 679, 682
(Wis. Ct. App. 1998)).

While this statement is dicta, it was considered dicta,
which we find persuasive. Consistent with Lawson's
persuasive reasoning, and the foregoing explanation of the
rationale of applying it to an ERISA context, we hold that
the phrase 'symptoms . . . for which you received Medical
Care' in the Hartford policy necessarily connotes an intent
to treat or uncover the particular ailment which causes that
symptom (even absent a timely diagnosis), rather than
some nebulous or unspecified medical problem. To hold
otherwise would vitiate any meaningful distinction
between symptoms which are legitimately moored to an
'accidental bodily injury, sickness, mental illness,
pregnancy, or episode of substance abuse,' and those
which are not. It is simply not meaningful to talk about
symptoms in the abstract: Seeking medical care for a
symptom of a pre-existing condition can only serve as the
basis for exclusion from receiving benefits in a situation
where there is some intention on the part of the physician
or of the patient to treat or uncover the underlying
condition which is causing the symptom.

Such a holding does not mean that we require that a
'correct' diagnosis be made before the effective date of a
policy in order for an insurance company to be able to
deny coverage based on a pre-existing condition. In
Lawson, we explained the difference between a 'suspected
condition without a confirmatory diagnosis' and 'a
misdiagnosis or an unsuspected condition manifesting
non-specific symptoms.' 301 F.3d at 166. Despite
numerous consultations with physicians and multiple
MRIs which could have potentially revealed the existence
of MS before the effective policy date, neither McLeod

nor her physicians ever suspected that she was suffering the effects of MS. Indeed, as we have explained above, McLeod received on-going treatment for a host of other ailments for the years preceding the MS diagnosis with no suspicion on anyone's part that she was not receiving proper medical care. Under those circumstances, we are confident that McLeod's case is one either of 'misdiagnosis' or of 'unsuspected condition manifesting non-specific symptoms' rather than a 'suspected condition without a confirmatory diagnosis.' While there were multiple opportunities for the presence of MS to be revealed through the various testing McLeod underwent during the look-back period, none of the tests ever linked the symptoms she was experiencing to MS. We therefore conclude that the District Court erred as a matter of law when it held that Hartford's determination that McLeod had received medical care for symptoms of MS during the look-back period was not arbitrary and capricious.

*McLeod v. Hartford Life & Accident Ins. Co.*, 372 F.3d 618, 625-628 (3d Cir., 2004)

*McLeod's* analysis of Hartford's language is directly applicable to Dr. Haddad.  No one knew or suspected any left sided symptoms prior to the March 5, 2015 surgery.  Accordingly, he could not have been treated for those left side symptoms during the lookback period.

## IX
## Conclusion

The District Court erred in assuming that the language in the Certificate of Insurance was identical to that in the missing policy and Plan

document.  It erred in failing to apply the rules of contra proferentem, and the

reasonable expectations rule.  No reasonable person would assume that the pre-

existing condition exclusion applied to conditions which did not arise until after

the end of the lookback period.  In this case, the artificial disk was not placed until

after the end of the lookback period, and the left sided symptoms did not arise

until them.  There is no reasonable progression of the right sided radiculopathy to

the left sided one.


The judgment below should be reversed, and the case remanded with

instructions to enter judgment in favor of Dr. Haddad.  Dr. Haddad should recover

his attorneys fees in accord with *Smith v. CMTA-IAM Pension Trust,* 654 F. 2d

650 (9th Cir., 1981) which holds fees should ordinarily be awarded to prevailing

plan beneficiaries.


January 30, 2018            /s/Laurence F. Padway
                            Attorney for Dr. Fadi Haddad
                                Plaintiff-Appellant

Certificate of Compliance Rule 32(a)(7)

The undersigned counsel of record for appellant herein certifies that this brief is prepared in 14 point Times New Roman type and consists of 6706 words, excluding the signature, tables, this certificate and the proof of service.

Date: January 30, 2018

/s/ Laurence F Padway
Laurence F. Padway
Attorney for Fadi G. Haddad

## STATEMENT OF NO RELATED CASES

Appellant Fadi G. Haddad is unaware of any related case pending in this Court.

Dated: January 30, 2018

/s/ Laurence F Padway
Laurence F. Padway
Attorney for Fadi G. Haddad

CERTIFICATE OF SERVICE

The undersigned hereby declares under penalty of perjury that:

I am the attorney for appellant Fadi G. Haddad.

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeal for the Ninth Circuit by using the appellate CM/EFC system on January 30, 2018.

I certify that all participants in the case are registered CM/EFC users and that service will be accomplished by the appellate CM/EFC system.

/s/ Laurence F Padway
Laurence F. Padway
Attorney for Fadi G. Haddad